## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| CHURCH & DWIGHT CO., INC., a Delaware corporation and registered foreign corporation in Iowa,<br><br>Plaintiff,<br><br>vs.<br><br>MATTHEW HUSMAN, an individual,<br><br>and<br><br>ZEE COMPANY, a member of THE VINCIT COMPANY, LLC d/b/a THE VINCIT GROUP, a Tennessee limited liability company,<br><br>Defendants. | Case No.<br><br>JUDGE:<br><br>**COMPLAINT**<br><br>**(JURY DEMANDED)** |

Plaintiff CHURCH & DWIGHT CO., INC. ("C&D"), for its Complaint against Defendants MATTHEW HUSMAN, an individual, and ZEE COMPANY, a member of The Vincit Company, LLC d/b/a The Vincit Group ("Zee"), states and alleges:

### PARTIES

1.      C&D is the successor by merger to Passport Food Safety Solutions, Inc. ("Passport").  C&D is a Delaware corporation registered in the State of Iowa as a foreign corporation.  C&D has a principal place of business in Ewing, New Jersey, and it regularly conducts business in Iowa through its Arm & Hammer Animal and Food Production business ("Arm & Hammer"), which has a facility located at 6935 Vista Drive, West Des Moines, Iowa.

2.     Upon information and belief, Defendant Husman resides in Greenwood, Missouri.

3.     Defendant Zee Company is a member of The Vincit Company, LLC d/b/a The Vincit Group.  Zee Company is a citizen of Tennessee.[1]

4.     Husman is employed by Defendant Zee.  Thus, Husman is an agent of Zee.

## JURISDICTION AND VENUE

5.     Jurisdiction in this Court is proper under 28 U.S.C. § 1331, as both Husman and Zee have violated the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1833.

6.     Jurisdiction in this Court is also proper under 28 U.S.C. § 1332, as this action is between citizens of different states and the amount in controversy exceeds $75,000.

7.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because this is a judicial district in which a substantial part of the events or omissions giving rise to this action occurred and/or a substantial part of any property that is the subject of this action is situated.

## GENERAL ALLEGATIONS

8.     C&D, through its Arm & Hammer business, is in the business of distributing, developing, producing, marketing, promoting, and selling food safety products including bacteriophage and biocide products and also in architecting, building, installing, and operating advanced analytics food safety solutions.  These products include bacteriophage

---

[1] The Amended Agreement (referenced below at ¶7 and attached as Exhibit 2) and the Declaratory Judgment Action (referenced below at ¶54) both refer to "Zee Company, a member of the Vincit Company, LLC d/b/a The Vincit Group."  Further, according to the Tennessee Secretary of State website, "The Vincit Company, LLC" is a Tennessee limited liability company with one member, although the member is not identified.  Because the Amended Agreement and the Declaratory Judgment Action make clear that "Zee Company" is a member of The Vincit Company, LLC, upon information and belief, Zee Company is a citizen of Tennessee and is the sole member of this LLC.  Indeed, the referenced Declaratory Judgment Action says that "Zee is a Tennessee limited liability company with a principal office located in Chattanooga, Tennessee."

products sold by C&D under the Finalyse™ brand name and bromine chemistry sold by C&D under BoviBrom™ and other related brand names. Finalyse™ is used to reduce E.Coli and Salmonella during processing. BoviBrom™ and AviBrom™ are used to rinse animals after processing to kill off E.Coli and Salmonella to help ensure sanitization and safety of workers, equipment, and the environment.

9.    Zee directly competes with C&D in a number of ways, including the production of bacteriophage products that compete with the Finalyse™ brand and in the supply of bromine chemistry that competes with similar products sold by C&D (jointly hereafter "Competitive Products").

10.    Passport, and later C&D, employed Husman as Director of Sales from on or about September 16, 2016 through December 13, 2019.

11.    As a condition of his employment, Husman signed a Confidentiality, Non-Disclosure and Non-Solicitation Agreement ("Agreement"), effective September 1, 2016. (Agreement, attached as Exhibit 1).

12.    As part of the Agreement, Husman agreed that:

a)  "During [his] employment with [C&D] and for a period of two (2) years thereafter (the "Non-Solicit Period"), [Husman] shall not, directly or indirectly, solicit, induce or influence (or seek to induce or influence) any person who is employed by, or acts as a consultant for, [C&D] to terminate or alter [their] employment with [C&D]";

b)  … [Husman] shall not, directly or indirectly, communicate with, interfere with, call on or solicit any person, firm, corporation, business or other entity who or which is, or had been within the prior three years, a customer or known potential customer, or supplier or known potential supplier, [of C&D]."

c) "[Husman] has had or will have access to and has learned or will learn (i) information proprietary to [C&D] or its customers or affiliates that concerns the operation and methodology or [C&D's] Business as the same is now and hereafter conducted by [C&D] or (ii) other information proprietary to [C&D] or its customers or affiliates, including without limitation, financial information, … technical processes, derivatives and iterations, including any … trade secrets, know-how, formulas, processes, customers and supply lists and data, pricing and marketing plans, policies and strategies, details of customer and supplier relationships and contracts, operations, methods, product development techniques or plans, sales techniques, … designs and design projects, … and all other confidential information with respect to [C&D's] Business (collectively, "Proprietary Information").

d) "…from and after [September 1, 2016], [Husman] will keep confidential and will not disclosure directly or indirectly any [of C&D's] Proprietary Information to any third party and will not use for the benefit of [Husman] or any third party or otherwise misuse, misappropriate or exploit such Proprietary Information in any way."

e) "…upon termination of [Husman's] employment relationship with [C&D], [Husman] shall immediately return to [C&D] all property of [C&D] in [his] possession, use or control, including all originals and any and all copies of any files, documents, digital files, works, and other materials containing any Proprietary Information of [C&D] or its customers or affiliates."

f) "[Husman] shall not remove or cause or permit the removal, from [C&D's] facilities, or any unauthorized destruction of, any originals or copies of any files, documents, works and other materials containing any Proprietary Information of [C&D] or its affiliate's or customers."

13.    As Director of Sales for C&D, Husman was uniquely involved in, and had access to, C&D's Proprietary Information, including customer lists, customer-specific needs, supplier pricing, supplier information, research and development, product pricing and marketing plans and related product promotional information, specific customer pricing, customer purchase volumes, architectural designs and design projects, product design application points, equipment agreements, which customers owned equipment, and other business strategies.

14.     Husman resigned from his employment with C&D effective December 13, 2019 and commenced an employment relationship with Zee on or about December 23, 2019 as Director of Antimicrobials.

15.     At some point prior to his departure, Husman downloaded and/or emailed himself at mttusman@yahoo.com and/or daynahusman@gmail.com, certain electronic documents including, but not limited to, customer lists and contact information, pricing and profit margin information, product information, and lists of customer proposals and anticipated projects.  For example, on October 4, 2019, Husman sent ten separate customer contact lists, three proposals for the Finalyse™ or BoviBrom™ products sent to C&D customers, and a customer agreement with specific terms and conditions for the purchase of BoviBrom™.

16.     C&D made significant efforts to stop Husman from breaching the Agreement.  C&D's efforts included providing notice to Husman and Zee, obtaining written assurances (sworn under oath) from both Husman and Zee that they will comply with Husman's obligations under the Agreement and refrain from using or disclosing C&D's trade secrets and confidential information, and engaging a digital investigation and e-discovery firm to confirm C&D's trade secret and confidential information had been returned appropriately by Husman and/or Zee.

17.     In March 2020, as a direct result of C&D's efforts, C&D, Zee, and Husman entered an Amendment to the Confidentiality, Non-Disclosure and Non-Solicitation Agreement (together with the underlying Confidentiality, Non-Disclosure and Non-Solicitation Agreement, the "Amended Agreement").

18.    Pursuant to the Amended Agreement, Husman agreed that he "will not enter or directly or indirectly communicate with, interfere with, call on, or solicit anyone, including, without limitation, the plants, facilities, locations or individuals [at thirteen (13) specifically identified customers and/or potential customers of C&D]" (the "Hands-Off Customers").  (Amended Agreement, attached as Exhibit 2).

19.    The non-solicitation restrictions as applied to C&D's employees, consultants, suppliers, and potential suppliers (as well as Husman's obligations to keep C&D's Proprietary Information confidential, to return C&D's property and Proprietary Information, and to not use C&D's Proprietary Information for his benefit or the benefit of any third party, previously set forth in Paragraph 12 above) all remained in place in the Amended Agreement.

20.    The non-solicitation and/or non-interference restrictions in the Amended Agreement remained in place until December 13, 2021, and Husman's obligations with respect to C&D's Proprietary Information remain in place indefinitely.

21.    In reliance on and subject to Husman and Zee's continued compliance with their obligations in the Amended Agreement, C&D agreed not to pursue legal action against Husman and Zee based on conduct that occurred until the date of execution of the Amended Agreement.

## Husman Communicated With, and Zee Solicited, C&D's Customers in Breach of the Amended Agreement

22.    At some point after the Amended Agreement was signed, Husman left his employment with Zee.

23.    Upon information and belief, Husman re-joined Zee and commenced an employment relationship with Zee in early 2021.

24.    Upon information and belief, Zee hired Husman to develop and market the Competitive Products and to sell the Competitive Products to large meat producers, including to the Hands-Off Customers that Husman specifically agreed he would not "enter or directly or indirectly communicate with, interfere with, call on, or solicit" as part of the Amended Agreement.

25.    Since January 2021, Husman has called Brent Marnin, Account Manager for C&D ("Marnin"), approximately five times to inquire about C&D sales operations, including asking about C&D's confidential, strategic, and trade secret information while working for a direct competitor.

26.    In February or March 2021, Husman called Judy Ernst, C&D's Order Fulfillment Representative ("Ernst"), with whom Husman previously worked while employed by C&D.  During this conversation, Husman asked Ms. Ernst whether C&D still had the leather gloves that C&D previously provided to its customers.  Specifically, Husman told Ms. Ernst that an employee from Customer A (one of the Hands-Off Customers) liked the gloves, but that the pair he received from C&D were worn out, and that Husman wanted to procure a replacement pair from C&D for the employee at Customer A.  (Affidavit of Judy Ernst, attached as Exhibit 3).

27.    In one of Husman's conversations with Marnin, Husman also asked Marnin if he could provide him with a pair of the leather gloves so that Husman could give them to the employee at Customer A.  Again, Customer A is one of the Hands-Off Customers.

7

28.    In the weeks and months following this conversation, Customer A informed C&D that it would need to drop the price of its bromine chemistry and phage products or Customer A would purchase the products from a different source.

29.    On information and belief, with Husman's assistance, Zee offered to sell the Competitive Products to a Hands-Off Customer, Customer A, for a lower price than C&D during a period of 2021 that would violate the provisions of the Amended Agreement.

30.    On September 22, 2021, Customer B, another Hands-Off Customer, informed C&D of a price quote for the Competitive Products it received from Zee.

31.    As a result, C&D had to reduce its prices to keep Customer B from ending its relationship with C&D and purchasing Competitive Products from Zee.

32.    After Zee provided this quote to Customer B, on or around September 23, 2021, Marnin had a telephone conversation with Randy Johnston, an Area Manager for Zee, who provided the quote to Customer B.  In this call, Johnston told Marnin that he had no experience selling bromine chemistry products and neither did anyone else Zee, but that Husman had lots of experience selling bromine chemistry products from his past; that Husman was very familiar with the products, related equipment, and technology, and Husman passed this information on to Johnston and Zee's other Area Managers; that Husman directed Johnston and the other Area Managers at Zee of the specific customers to pursue to sell the Competitive Products, including Customer B and other companies that were Hands-Off Customers; and that Husman was leading Zee's marketing strategy and activities for the Competitive Products, including being involved in Zee providing the sales quote to Customer B.  (Affidavit of Brent Marnin, attached as Exhibit 4).

8

33.    On or around November 11, 2021, an employee of Customer C, one of C&D's customers, called Marnin and told him that Zee offered to sell Customer C Competitive Products for a lower price than what C&D was currently charging them. (Affidavit of Brent Marnin, attached as Exhibit 4).

34.    As a result, C&D had to lower the price of its bromine chemistry products to keep Customer C as a customer.

35.    On December 8, 2021, Customer D, another Hands-Off Customer, informed C&D that it was ending its relationship with C&D and instead going to purchase Competitive Products from Zee.

36.    Husman had direct and/or indirect involvement in Zee offering the Competitive Products to Customers A, B, and D (all of which were Hands-Off Customers) for a lower price than C&D in violation of the Amended Agreement, and he did so during the restricted period in the Amended Agreement that ran through December 13, 2021.

37.    Further, Zee utilized C&D's trade secrets and confidential information and/or acted in concert with Husman in violation of the Amended Agreement to offer the Competitive Products to Customers A, B, and D.

38.    As a result of Husman and/or Zee's unlawful actions, C&D was forced to reduce the prices it charged to Customer A and Customer B, and C&D lost all of Customer D's business.

39.    As a result of Husman and/or Zee's unlawful actions with respect to Customers A, B, and D, and other C&D customers, C&D has been damaged in excess of $675,000 in 2021 alone and C&D's damages are ongoing.

## Zee's Misrepresentations

40.    For many years, C&D has been a distributor of bromine chemistry products supplied by Albemarle.

41.    In June 2021, Zee contacted Albemarle and told them that C&D reached an agreement with Husman to allow him to work with Zee to sell the Competitive Products to C&D's customers, including the Hands-Off Customers, and therefore Albemarle should not be concerned about working with Husman during the course and scope of his employment with Zee.

42.    This statement by Zee was not true. There is no provision in the Amended Agreement that would allow or permit Husman to directly or indirectly sell Competitive Products to the Hands-Off Customers through December 13, 2021.

43.    On or around November 11, 2021, an employee of Customer C, one of C&D's customers, called Marnin and told him that Nick Moore (an Area Manager for Zee) also told him that Zee had the exclusive right to sell the bromine chemistry products supplied by Albermarle.

44.    In November 2021, Moore made this false and deceptive statement to Customer C that Zee had an exclusive right to sell products supplied by Albermarle in an attempt to convince Customer C to stop buying products from C&D and instead to purchase Competitive Products from Zee.

45.    C&D took action to prevent Zee and Moore from making such false and deceptive statements, including notifying Zee's counsel of Moore's false and deceptive statement made to C&D's customer.

46.    Zee admitted that Moore falsely represented Zee as the exclusive distributor of the Albemarle products to Customer C and Moore subsequently contacted Customer C to correct his misrepresentation.  (See Letter and Email, attached as Exhibit 5).

47.    Husman and Zee have tortiously interfered with C&D's relationship with its supplier, Albemarle, as well as C&D's customer relationships.

48.    As a direct result of Zee and Moore's deceptive and unfair trade practices, C&D has incurred damages, including damaging C&D's reputation and standing in a small and tightknit food safety industry, reputational harm, and decreasing C&D's goodwill.

**After Receiving a Draft Complaint and a Demand Letter from C&D on February 17, 2022, Zee and Husman Filed a Declaratory Judgment Action on February 24, 2022 in Tennessee State Court Aimed at End-Running This Lawsuit**

49.    To potentially avoid litigation for these breaches and actionable conduct by Zee and Husman, C&D sent a draft Complaint to outside counsel for Zee and Husman on February 17, 2022.

50.    This draft Complaint sent on February 17, 2022 contained:

- the case caption (for the U.S. District Court for the Southern District of Iowa);

- the factual allegations above;

- the legal claims below; and

- the same exhibits as are attached to this actual Complaint.

51.    Otherwise stated, the draft Complaint sent to Zee and Husman on February 17 largely tracks with this actual Complaint except for the addition of these new paragraphs 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58.

52.     The draft Complaint was sent by C&D on February 17 as an attachment to a demand letter sent to Zee and Husman.

53.     The February 17 demand letter provided a February 24 deadline for responding and made clear that litigation would follow if the matter was not resolved.

54.     Instead of responding by the February 24 deadline, Zee and Husman filed a Complaint for Declaratory Judgment in the Chancery Court for Hamilton County, Tennessee (the "Declaratory Judgment Action").

55.     The Declaratory Judgment Action seeks a declaratory judgment that Zee and Husman "are not in breach of the Agreement and/or the Amended Agreement and that C&D is not entitled to an award of damages."

56.     The Declaratory Judgment Action does not seek to resolve legal issues and instead seeks to resolve factual issues (i.e., did Zee and Husman breach the Agreements, and did C&D suffer resulting damages).

57.     Moreover, federal case law makes clear that courts do not follow the first-to-file rule where special circumstances exist, such as where the first-filed suit is a declaratory judgment action triggered by receipt of a notice letter.

58.     Those very same circumstances exist here.

## COUNT I- BREACH OF CONTRACT
### (Against Husman)

59.     C&D incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

60.    Husman agreed to be bound by the by the valid and enforceable covenants in

the Amended Agreement including:

a.  To "…not, directly or indirectly, solicit, induce or influence (or seek to induce or influence) any person who is employed by, or acts as a consultant for, [C&D] to terminate or alter [their] employment with [C&D]" through December 13, 2021;

b.  That "… [Husman] shall not, directly or indirectly, communicate with, interfere with, call on or solicit any person, firm, corporation, business or other entity who or which is, or had been within the prior three years, a … supplier or known potential supplier, [of C&D]" through December 13, 2021;

c.  That he "will not enter or directly or indirectly communicate with, interfere with, call on, or solicit anyone, including, without limitation, the plants, facilities, locations or individuals [at the Hands-Off Customers]" through December 13, 2021;

d.  That "[Husman] has had or will have access to and has learned or will learn (i) information proprietary to [C&D] or its customers or affiliates that concerns the operation and methodology or [C&D's] Business … or (ii) other information proprietary to [C&D] or its customers or affiliates, including [the "Proprietary Information"];

e.  That "… [Husman] will keep confidential and will not disclosure directly or indirectly any [of C&D's] Proprietary Information to any third party and will not use for the benefit of [Husman] or any third party or otherwise misuse, misappropriate or exploit such Proprietary Information in any way.";

f.  That "…upon termination of [Husman's] employment relationship with [C&D], [Husman] shall immediately return to [C&D] all property of [C&D] in [his] possession, use or control, including all originals and any and all copies of any files, documents, digital files, works, and other materials containing any Proprietary Information of [C&D] or its customers or affiliates."; and

g.  That "[Husman] shall not remove or cause or permit the removal, from [C&D's] facilities, or any unauthorized destruction of, any originals or copies of any files, documents, works and other materials containing any Proprietary Information of [C&D] or its affiliate's or customers."

(Amended Agreement, attached as Exhibit 2).

61.     Husman received adequate and sufficient consideration for entering into the covenants set forth in the Amended Agreement.

62.     C&D has fulfilled all of its obligations under the Amended Agreement, and has not breached the Amended Agreement.

63.     By contacting and directly or indirectly contacting and soliciting the Hands-Off Customers, including Customers A, B, and D, Husman has violated the Amended Agreement.

64.     By utilizing C&D's trade secret and confidential information to sell Competitive Products to C&D's actual and/or potential customers, Husman has violated the Amended Agreement.

65.     Husman's actions deprived C&D of the benefits of the Amended Agreement, including Husman not directly or indirectly communicating with, interfering with, calling on, or soliciting the Hands-Off Customers for the two year period following the end of his employment, and as a result C&D is entitled to a preliminary and permanent injunction ordering an additional 12 months of compliance by Husman with the Amended Agreement.

66.     Husman's violations of the Amended Agreement have caused C&D over $675,000 in damages in 2021 alone and will continue to cause C&D harm, including irreparable harm to C&D's business interests and goodwill and economic damages in an amount to be proven at trial.

## COUNT II- MISAPPRORIATION OF TRADE SECRETS – DEFEND TRADE SECRETS ACT OF 2016
### (Against Husman and Zee)

67.    C&D incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

68.    As Director of Sales for Passport and later C&D, Husman was uniquely involved in, and had access to, C&D's trade secret and confidential information, including customer lists, customer-specific needs, supplier pricing, supplier information, research and development, product pricing and marketing plans and related product promotional information, specific customer pricing, customer purchase volumes, architectural designs and design projects, product design application points, equipment agreements, which customers owned equipment, and other business strategies.

69.    At all times, individually and as Zee's agent, Husman's use and/or disclosure of C&D's trade secret and confidential information to assist Zee, a competitor of C&D, constitutes a misappropriation of trade secrets under the federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1833, and this misappropriation has caused C&D harm.

70.    C&D's confidential and proprietary information, including customer lists, customer-specific needs, supplier pricing, supplier information, research and development, product pricing and marketing plans and related product promotional information, specific customer pricing, customer purchase volumes, architectural designs and design projects, product design application points, equipment agreements, which customers owned equipment, and other business strategies, is trade secret information, as defined in the DTSA, because it is confidential business information and/or confidential business plans,

financial information, and the listing of names, addresses, or telephone numbers that relate to the sale of products and servicing of account in interstate commerce.

71.    C&D derives independent economic value from the fact that its confidential and proprietary information is not generally known to, or readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use. Indeed, if a competitor were to take all of that information and use it against C&D, C&D's customer relationships would be imperiled, causing irreparable harm to C&D.

72.    C&D's trade secret and confidential information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, which efforts include having employees with access to confidential and proprietary information, like Husman, execute non-solicit and confidentiality agreements as a condition of employment, promising that they will not use or disclose C&D's trade secrets or confidential information, limiting access to this information to individuals with a business need to know, and storing confidential information on secure and password protected computer systems.

73.    Husman shared C&D's trade secret and confidential information with Zee, individuals have utilized that information on behalf of Zee to unlawfully compete with C&D, and Zee therefore has used that information in violation of the DTSA.

74.    Husman's extensive and intimate knowledge about C&D's trade secrets and confidential information and his apparent role at Zee, including his involvement in selling Competitive Products, has and will continue to result in his inevitable reliance on and/or

disclosure of C&D's trade secrets and confidential information to assist Zee in its development, marketing, and sales of the Competitive Products.

75.    Husman and Zee have misappropriated C&D's trade secret information and their conduct has caused and will continue to cause C&D irreparable harm, as well as monetary damages in excess of $675,000 in 2021 alone and continuing damages in an amount to be determined at trial, including but not limited to actual loss, unjust enrichment, or any other method that is reasonable to make C&D whole.

76.    C&D is entitled to an order of this Court enjoining the actual or threatened misappropriation of its trade secrets by Husman and Zee to eliminate the commercial advantage that otherwise would be derived from the misappropriation.

77.    C&D is also entitled to recover an award of exemplary damages and attorney fees against Husman and Zee pursuant to the DTSA.

## COUNT III - TORTIOUS INTERFERNCE WITH CONTRACT
### (Against Husman and Zee)

78.    C&D incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

79.    C&D has ongoing business relationships with its customers for the purchase of Finalyse™ products, BoviBrom™, and other bromine chemistry products sold by C&D.

80.    Husman and Zee have knowledge of C&D's relationship with its customers, including but not limited to the Hands-Off Customers.

81.    Husman and Zee tortiously and unlawfully interfered with C&D's customer relationships by making false and deceptive statements relating to Zee having exclusivity

to sell the Albemarle products and by using C&D's trade secret and confidential information to sell Competitive Products to C&D's customers.

82.    Husman and Zee have intentionally interfered with C&D's existing and/or potential customer relationship by engaging in unlawful competitive activities in violation of Husman's contractual, statutory, and common law obligations, and by retaining, using and/or disclosing C&D's trade secret or confidential information to assist a competitor of C&D.

83.    Husman's and Zee's intentional interference with C&D's customer relationships was for an improper purpose, namely, to injure C&D and to improperly benefit Husman and Zee.

84.    Husman's and Zee's intentional interference with C&D's customer relationships was willful, malicious, and done in bad faith.

85.    Husman and Zee's tortious acts have caused and will continue to cause C&D harm, including irreparable harm and monetary damages in excessive of $675,000 in 2021 alone and continuing damages in an amount to be proven at trial.

## COUNT IV- CIVIL CONSPIRACY
### (Against Husman and Zee)

86.    C&D incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

87.    Zee knew of and was aware of Husman's contractual obligations owed to C&D, including being prohibited from directly or indirectly communicating with and/or

soliciting the Hands-Off Customers through at least December 13, 2021 and not using or disclosing C&D's trade secret and confidential information to compete with C&D.

88.     Husman and Zee acted together to violate the contractual obligations Husman owed to C&D, including misappropriating C&D's trade secret and confidential information to solicit C&D's customers to purchase the Competitive Products and tortiously interfering with C&D's supplier and/or customer relationships.

89.     Zee and Husman intentionally engaged in this unlawful activity for the express purpose of unlawfully diverting C&D's customers, including the Hands-Off Customers, to Zee.

90.     As a direct and proximate result of the Zee and Husman's unlawful conspiracy, C&D has sustained injuries including, but not limited to, loss of the benefit of its contractual rights, loss of the benefit of C&D's customer relationships and/or expectancies, loss of goodwill, loss of its business reputation, and loss of business opportunities.

91.     As a direct and proximate consequence of Husman and Zee's conduct, C&D has been damaged including irreparable harm to its goodwill and customer relationships, and monetary damages in excess of $675,000 in 2021 alone and continuing damages in an amount to be proven at trial.

92.     Zee and Husman's conduct was willful, malicious, and done in conscious disregard of C&D's rights, entitling C&D to punitive damages and attorneys' fees and costs in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, C&D prays for the following relief jointly and severally against Husman and Zee:

(a)    On its First Claim for Relief, injunctive relief in the form of a preliminary and permanent injunction enjoining Husman from using and/or disclosing C&D's trade secret and confidential information and breaching his contractual obligations owed to C&D, a preliminary and permanent injunction ordering an additional twelve (12) months of compliance by Husman with the Amended Agreement, and an award of damages caused by Husman's breach of the Amended Agreement, including but not limited to economic damages in excess of $675,000 in 2021 and ongoing damages to be determined at trial;

(b)    On its Second Claim for Relief, injunctive relief in the form of a preliminary and permanent injunction enjoining Husman and Zee from misappropriating C&D's trade secret and confidential information to unlawfully compete with C&D, and award of economic damages caused by Zee and Husman's misappropriation in excess of $675,000 in 2021 and ongoing damages, and an award of exemplary and/or punitive damages and attorneys' fees, in amounts to be determined at trial;

(c)    On its Third Claim for Relief, injunctive relief and an award of damages caused by Zee's tortious interference, including but not limited to economic damages in excess of $675,000 in 2021 and ongoing damages to be determined at trial;

(d)    On its Fourth Claim for Relief, injunctive relief, an award of damages caused by Husman and Zee's unlawful conduct, including but not limited to economic damages in

excess of $675,000 in 2021 alone and ongoing damages to be determined at trial, and an

award of punitive damages in an amount to be determined at trial;

    (e)    Costs, fees, and attorney fees; and

    (f)    Such other or further relief that the Court deems appropriate.

## JURY DEMAND

C&D demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

Dated:  March 1, 2022

Respectfully submitted,

**OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P. C.**

*s/Patrick R. Martin*
Patrick R. Martin (AT0010010)
Capella Tower
225 South Sixth Street, Suite 1800
Minneapolis, MN  55402
Telephone:  612.339.1818
Fax:  612.339.0061
pat.martin@ogletreedeakins.com

*Attorneys for Church & Dwight Co., Inc.*

50494115.v1-Ogletree

# EXHIBIT 1

# CONFIDENTIALITY, NON-DISCLOSURE

## AND

## NON-SOLICITATION AGREEMENT

THIS CONFIDENTIALITY, NON-DISCLOSURE AND NON-SOLICITATION AGREEMENT (this "Agreement") is made and entered into effective September 1, 2016 (the "Effective Date") by and between Passport Food Safety Solutions, Inc., a Utah corporation ("Company"), and Matthew Husman, the undersigned individual ("Promisor").

### RECITALS

A.    Company is in the business of distributing, developing, producing, marketing and selling food safety products including bacteriophage and biocide products and in architecting, building, installing and operating advanced analytics solutions (collectively "Company Products"), (all such foregoing activities together with such additional business activities which the Company may engage in in the future, collectively referred to as "Company Business").

B.    In the course of conducting the Company Business, certain trade and business information proprietary to Company, and its customers, and which Company considers confidential, may be provided to Promisor.

C.    As a condition to Promisor's employment by Company, Company and Promisor now desire to enter into this Agreement in order to protect such propriety confidential information of Company, and its customers, and to protect the Company Business.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereby agree as follows:

### AGREEMENT

1.    **Confidentiality.**  Promisor understands and acknowledges that Promisor has had or will have access to and has learned or will learn (i) information proprietary to Company or its customers or affiliates that concerns the operation and methodology of the Company Business as the same is now and hereafter conducted by Company or (ii) other information proprietary to Company or its customers or affiliates, including, without limitation, financial information, patents, patent and trademark applications, patent searches and analyses, technical processes, derivatives and iterations, including any software and related source code, algorithms, trade secrets, know-how, formulas, processes, customers and supply lists and data, pricing and marketing plans, policies and strategies, details of customer and supplier relationships and contracts, operations, methods, product development techniques or plans, sales techniques, business acquisition plans, new personnel acquisition plans, designs and design projects, inventions and research projects, web-site, and all other confidential information with respect to Company Business (collectively, "Propriety Information").  Promisor agrees that, from and after the Effective Date, Promisor will keep confidential and will not disclose directly or indirectly any such Proprietary Information to any third party and will not use for the benefit of Promisor or any third party or otherwise misuse, misappropriate or exploit such Proprietary Information in

any way.  The restrictions contained herein shall not apply to any specific information that (a) was already developed and exploited by those engaged in the industry in which Company conducts the Company Business at the time of disclosure, or is subsequently developed and exploited by those engaged in the industry in which Company conducts the Company Business otherwise than by breach of this Agreement, or (b) was disclosed due to a requirement of law, provided that Promisor shall have given prompt notice of such requirement to Company to enable Company to seek an appropriate protective order with respect to such disclosure.

2.     **Agreement Not to Solicit.**

a.     During Promisor's employment with Company and for a period of two (2) years thereafter (the "Non-Solicit Period"), Promisor shall not, directly or indirectly, solicit, induce or influence (or seek to induce or influence) any person who is employed by, or acts as a consultant for, Company to terminate or alter this or her employment with Company.

b.     Except as permitted by Company, during the Non-Solicit Period, Promisor shall not, for competitive purposes, directly or indirectly, communicate with, interfere with, call on or solicit any person, firm corporation, business or other entity who or which is, or had been within the prior three years, a customer or known potential customer, or supplier or known potential supplier, or Company.  For purposes of this Section 2(b), a potential customer includes a person or entity, known to Promisor, that has been the subject of a written or oral bid, offer or proposal by Company, or the subject of substantial preparation with a view to making such a bid, proposal or offer within the prior three years.  A potential supplier includes a person or entity, known to Promisor, that has made a written or oral bid, offer or proposal to Company, or whom Company has solicited as a supplier, or made substantial preparation with a view to soliciting, within the prior three years

3.     **Return of Materials.**  Promisor agrees that, upon termination of Promisor's employment relationship with Company, Promisor shall immediately return to Company all property of Company in Promisor's possession, use or control, including all originals and any and all copies of any files, documents, digital files, works and other materials containing any Proprietary Information of Company or its customers or affiliates.  Promisor shall not remove, or cause or permit the removal, from Company's facilities, or any unauthorized destruction of, any originals or copies of any files, documents, works and other materials containing any Proprietary Information of Company or its affiliates or customers.

4.     **Ownership of Inventions.**  Promisor hereby assigns and transfers to Company any and all inventions, discoveries, ideas, concepts, innovations and original works of authorship (whether deemed patentable or not), made, originated, developed, authored, reduced to practice or conceived of by Promisor (or jointly with others) during the term of Promisor's employment relationship with Company (whether made during or after normal business hours, or at or away from Company's facilities) relating to or useful in Company Business, including all rights and interests with respect to any business models, programs, method, process, technique, apparatus, treatment or product.  Promisor agrees to promptly and fully disclose to Company all such inventions and innovations.  Promisor agrees to execute any reasonable document prepared by Company that is necessary or appropriate to document, perfect or give effect to the intent of this Section 4 or to secure any patent, copyright registration or other protection thereof.

5.    **Prior Third Party Agreements.**    Promisor represents and warrants that Promisor's employment relationship with Company does not violate or breach any confidential relationship between Promisor and any other party. Promisor further agrees that Promisor will not use for Company's benefit or disclose to Company any Proprietary Information of any third party that Promisor is prohibited (by agreement or otherwise) from so using or disclosing. Promisor also represents that Promisor has disclosed to Company any such confidential relationships and relevant agreements and prohibitions. Promisor further agrees to indemnify and hold Company harmless from all damages, expense, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, breach of this Section 5.

6.    **Interpretation and Acknowledgement.**

a.    It is the intention of the parties that the non-solicitation covenants contained in Section 2 of this Agreement be enforced to the greatest extent (but to no greater extent) in time, area and degree of participation as is permitted by the applicable law. To this end, the parties agree that such covenants shall be construed to extend in time and territory and with respect to degree of participation only so far as they may be enforced, and that such covenants are to that end hereby declared divisible and severable since it is a purpose of this Agreement to govern competition by Promisor anywhere in and outside the United States.

b.    Promisor acknowledges that Promisor's covenants and agreements in Section 2 of this Agreement are reasonable and necessary to protect Company's legitimate interest in its Proprietary Information. Promisor acknowledges that Section 2 of this Agreement is not so broad as to prevent Promisor from earning a livelihood or practicing Promisor's chose profession after termination or expiration of this Agreement. The parties understand and agree that the consideration provided for in Section 7 of this Agreement is in substantial part in consideration for Promisor's covenants in Section 2 hereof.

c.    Promisor acknowledges and agrees that this Agreement shall apply to any Company Proprietary Information first disclosed to Promisor prior to the Effective Date with the same force and effect as Proprietary Information first disclosed after the Effective Date. Similarly, this Agreement shall apply to any inventions or other intellectual property described in Section 4 invented or conceived of prior to the Effective Date with the same force and effect as Proprietary Information first invented or conceived of after the Effective Date.

d.    As used in this Agreement, the term "employment" includes both employer-employee relationships and independent contractor relationships.

7.    **Consideration.**    Promisor's covenants and promises set forth in this Agreement are in return for Promisor's employment by Company and the opportunity for Promisor to participate in certain programs that may be implemented by Company in its discretion, and Promisor hereby acknowledges the sufficiency and adequacy of such consideration.

8.    **Enforcement.**    For any breach of the provisions of this Agreement, Promisor agrees that Company shall be entitled to such remedies as are provided under Utah law.

9.    **Miscellaneous.**    This Agreement is binding upon and for the benefit of the parties, their respective officers, directors, employees, partners, principals, successors and

assigns.  The right to receive Proprietary Information may not be assigned.  Failure to enforce any provision of this Agreement shall not constitute a waiver of any term hereof.  This Agreement shall be governed by the laws of the State of Utah, without giving effect to any choice or conflict of law provision or rule (whether in the State of Utah or any other jurisdiction) that would cause the application of the laws of any jurisdictions other than the State of Utah.  If legal action is commenced by the parties hereto with respect to the subject matter hereof, the parties agree that the jurisdiction and venue of such action shall exclusively be in state or federal Utah courts of competent jurisdiction.  The parties hereby accept such State's exclusive jurisdiction and agree to accept service of process as if they were personally present and served within such jurisdiction.  The prevailing party in any action or proceeding to enforce this Agreement shall be entitled to its reasonable attorney's fees and costs incurred in connection therewith.

**COMPANY:**

PASSPORT FOOD SAFETY SOLUTIONS, INC.,
a Utah Corporation

By: _____

Name: Thomas D Nicholson
Title: President

**PROMISOR:**

Matthew Husman

_____
Name:

# EXHIBIT 2

# CONFIDENTIALITY, NON-DISCLOSURE

## AND

## NON-SOLICITATION AGREEMENT

THIS CONFIDENTIALITY, NON-DISCLOSURE AND NON-SOLICITATION AGREEMENT (this "Agreement") is made and entered into effective September 1, 2016 (the "Effective Date") by and between Passport Food Safety Solutions, Inc., a Utah corporation ("Company"), and Matthew Husman, the undersigned individual ("Promisor").

## RECITALS

A.    Company is in the business of distributing, developing, producing, marketing and selling food safety products including bacteriophage and biocide products and in architecting, building, installing and operating advanced analytics solutions (collectively "Company Products"), (all such foregoing activities together with such additional business activities which the Company may engage in in the future, collectively referred to as "Company Business").

B.    In the course of conducting the Company Business, certain trade and business information proprietary to Company, and its customers, and which Company considers confidential, may be provided to Promisor.

C.    As a condition to Promisor's employment by Company, Company and Promisor now desire to enter into this Agreement in order to protect such propriety confidential information of Company, and its customers, and to protect the Company Business.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereby agree as follows:

## AGREEMENT

1.    **Confidentiality.**  Promisor understands and acknowledges that Promisor has had or will have access to and has learned or will learn (i) information proprietary to Company or its customers or affiliates that concerns the operation and methodology of the Company Business as the same is now and hereafter conducted by Company or (ii) other information proprietary to Company or its customers or affiliates, including, without limitation, financial information, patents, patent and trademark applications, patent searches and analyses, technical processes, derivatives and iterations, including any software and related source code, algorithms, trade secrets, know-how, formulas, processes, customers and supply lists and data, pricing and marketing plans, policies and strategies, details of customer and supplier relationships and contracts, operations, methods, product development techniques or plans, sales techniques, business acquisition plans, new personnel acquisition plans, designs and design projects, inventions and research projects, web-site, and all other confidential information with respect to Company Business (collectively, "Propriety Information").  Promisor agrees that, from and after the Effective Date, Promisor will keep confidential and will not disclose directly or indirectly any such Proprietary Information to any third party and will not use for the benefit of Promisor or any third party or otherwise misuse, misappropriate or exploit such Proprietary Information in

any way. The restrictions contained herein shall not apply to any specific information that (a) was already developed and exploited by those engaged in the industry in which Company conducts the Company Business at the time of disclosure, or is subsequently developed and exploited by those engaged in the industry in which Company conducts the Company Business otherwise than by breach of this Agreement, or (b) was disclosed due to a requirement of law, provided that Promisor shall have given prompt notice of such requirement to Company to enable Company to seek an appropriate protective order with respect to such disclosure.

2.    **Agreement Not to Solicit.**

a.    During Promisor's employment with Company and for a period of two (2) years thereafter (the "Non-Solicit Period"), Promisor shall not, directly or indirectly, solicit, induce or influence (or seek to induce or influence) any person who is employed by, or acts as a consultant for, Company to terminate or alter this or her employment with Company.

b.    Except as permitted by Company, during the Non-Solicit Period, Promisor shall not, for competitive purposes, directly or indirectly, communicate with, interfere with, call on or solicit any person, firm corporation, business or other entity who or which is, or had been within the prior three years, a customer or known potential customer, or supplier or known potential supplier, or Company. For purposes of this Section 2(b), a potential customer includes a person or entity, known to Promisor, that has been the subject of a written or oral bid, offer or proposal by Company, or the subject of substantial preparation with a view to making such a bid, proposal or offer within the prior three years. A potential supplier includes a person or entity, known to Promisor, that has made a written or oral bid, offer or proposal to Company, or whom Company has solicited as a supplier, or made substantial preparation with a view to soliciting, within the prior three years

3.    **Return of Materials.**    Promisor agrees that, upon termination of Promisor's employment relationship with Company, Promisor shall immediately return to Company all property of Company in Promisor's possession, use or control, including all originals and any and all copies of any files, documents, digital files, works and other materials containing any Proprietary Information of Company or its customers or affiliates. Promisor shall not remove, or cause or permit the removal, from Company's facilities, or any unauthorized destruction of, any originals or copies of any files, documents, works and other materials containing any Proprietary Information of Company or its affiliates or customers.

4.    **Ownership of Inventions.**    Promisor hereby assigns and transfers to Company any and all inventions, discoveries, ideas, concepts, innovations and original works of authorship (whether deemed patentable or not), made, originated, developed, authored, reduced to practice or conceived of by Promisor (or jointly with others) during the term of Promisor's employment relationship with Company (whether made during or after normal business hours, or at or away from Company's facilities) relating to or useful in Company Business, including all rights and interests with respect to any business models, programs, method, process, technique, apparatus, treatment or product. Promisor agrees to promptly and fully disclose to Company all such inventions and innovations. Promisor agrees to execute any reasonable document prepared by Company that is necessary or appropriate to document, perfect or give effect to the intent of this Section 4 or to secure any patent, copyright registration or other protection thereof.

5.    **Prior Third Party Agreements.**    Promisor represents and warrants that Promisor's employment relationship with Company does not violate or breach any confidential relationship between Promisor and any other party.  Promisor further agrees that Promisor will not use for Company's benefit or disclose to Company any Proprietary Information of any third party that Promisor is prohibited (by agreement or otherwise) from so using or disclosing.  Promisor also represents that Promisor has disclosed to Company any such confidential relationships and relevant agreements and prohibitions.  Promisor further agrees to indemnify and hold Company harmless from all damages, expense, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, breach of this Section 5.

6.    **Interpretation and Acknowledgement.**

a.    It is the intention of the parties that the non-solicitation covenants contained in Section 2 of this Agreement be enforced to the greatest extent (but to no greater extent) in time, area and degree of participation as is permitted by the applicable law.  To this end, the parties agree that such covenants shall be construed to extend in time and territory and with respect to degree of participation only so far as they may be enforced, and that such covenants are to that end hereby declared divisible and severable since it is a purpose of this Agreement to govern competition by Promisor anywhere in and outside the United States.

b.    Promisor acknowledges that Promisor's covenants and agreements in Section 2 of this Agreement are reasonable and necessary to protect Company's legitimate interest in its Proprietary Information.  Promisor acknowledges that Section 2 of this Agreement is not so broad as to prevent Promisor from earning a livelihood or practicing Promisor's chose profession after termination or expiration of this Agreement.  The parties understand and agree that the consideration provided for in Section 7 of this Agreement is in substantial part in consideration for Promisor's covenants in Section 2 hereof.

c.    Promisor acknowledges and agrees that this Agreement shall apply to any Company Proprietary Information first disclosed to Promisor prior to the Effective Date with the same force and effect as Proprietary Information first disclosed after the Effective Date.  Similarly, this Agreement shall apply to any inventions or other intellectual property described in Section 4 invented or conceived of prior to the Effective Date with the same force and effect as Proprietary Information first invented or conceived of after the Effective Date.

d.    As used in this Agreement, the term "employment" includes both employer-employee relationships and independent contractor relationships.

7.    **Consideration.**  Promisor's covenants and promises set forth in this Agreement are in return for Promisor's employment by Company and the opportunity for Promisor to participate in certain programs that may be implemented by Company in its discretion, and Promisor hereby acknowledges the sufficiency and adequacy of such consideration.

8.    **Enforcement.**  For any breach of the provisions of this Agreement, Promisor agrees that Company shall be entitled to such remedies as are provided under Utah law.

9.    **Miscellaneous.**  This Agreement is binding upon and for the benefit of the parties, their respective officers, directors, employees, partners, principals, successors and

assigns.  The right to receive Proprietary Information may not be assigned.  Failure to enforce any provision of this Agreement shall not constitute a waiver of any term hereof.  This Agreement shall be governed by the laws of the State of Utah, without giving effect to any choice or conflict of law provision or rule (whether in the State of Utah or any other jurisdiction) that would cause the application of the laws of any jurisdictions other than the State of Utah.  If legal action is commenced by the parties hereto with respect to the subject matter hereof, the parties agree that the jurisdiction and venue of such action shall exclusively be in state or federal Utah courts of competent jurisdiction.  The parties hereby accept such State's exclusive jurisdiction and agree to accept service of process as if they were personally present and served within such jurisdiction.  The prevailing party in any action or proceeding to enforce this Agreement shall be entitled to its reasonable attorney's fees and costs incurred in connection therewith.

**COMPANY:**

PASSPORT FOOD SAFETY SOLUTIONS, INC.,
a Utah Corporation

By: _____

Name: Thomas D Nicholson
Title: President

**PROMISOR:**

Matthew Husman

_____
Name:

## Amendment to the Confidentiality, Non-Disclosure and Non-Solicitation Agreement

Matthew Husman and Church & Dwight Co., Inc. ("C&D") as successor by merger of Passport Food Safety Solutions, Inc. ("Passport") are parties to the Confidentiality, Non-Disclosure and Non-Solicitation Agreement (the "Non-Solicit Agreement"). The Non-Solicit Agreement is attached as Exhibit A and incorporated in this Amendment by reference. The Non-Solicit Agreement shall remain in full force and effect except as amended by this Amendment to the Confidentiality, Non-Disclosure and Non-Solicitation Agreement (this "Amendment").

C&D threatened legal action against Mr. Husman and Zee Company, a member of The Vincit Company, LLC d/b/a The Vincit Group ("Zee"). Mr. Husman, C&D and Zee are referred to collectively in this Amendment as the Parties. Copies of the cease and desist letters are attached as Exhibits B and C, respectively.

The parties now seek to resolve the disputes identified in Exhibits B and C. In consideration of the mutual covenants contained in this Amendment as well as other good and valuable consideration, including C&D's agreement not to pursue legal action against Mr. Husman and Zee based on their conduct to date, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to amend the Non-Solicit Agreement as follows:

2.   **Agreement Not to Solicit**:

a.   The "Non-Solicit Period" will be a period of two (2) years commencing on December 13, 2019.

b.   The prohibitions against direct or indirect solicitation in the Non-Solicit Agreement shall apply during the Non-Solicit Period, but the restricted "customer or known potential customer," for purposes of those non-solicitation prohibitions, shall be limited as follows so that Zee and Mr. Husman agree that Mr. Husman will not enter or directly or indirectly communicate with, interfere with, call on, or solicit anyone, including, without limitation, the plants, facilities, locations or individuals mentioned below or any of their successors, assigns or affiliates:





Zee's custodian of records, has executed an affidavit, attached and incorporated herein as Exhibit D, certifying that the custodian has conducted a search of Zee's document management systems and all other Zee databases and has certified that the custodian recovered no documents described in Exhibit D.

Mr. Husman has executed an affidavit, attached and incorporated herein as Exhibit E, certifying that he has deleted or caused to be deleted from his personal email account

2

or any other email address or account or storage device and returned or destroyed all hard copies (if applicable) of all confidential, proprietary, and/or trade secret information belonging to C&D and did not transmit any confidential, proprietary, and/or trade secret information belonging to C&D to any other person or entity, including Zee.

A third-party forensic technology vendor has executed an affidavit, attached and incorporated herein as Exhibit F, certifying that the vendor has deleted or caused to be deleted from Mr. Husman's cell phone, computer, or other storage device all documents described in Exhibit F, which are confidential, proprietary, and/or trade secret information belonging to C&D.

Subject to Mr. Husman and Zee's compliance with the Non-Solicit Agreement as amended by this Amendment and based on the information possessed by C&D today, C&D withdraws any objection to Zee's employment of Mr. Husman. C&D's limited waiver in this regard applies only to Mr. Husman's employment with Zee and not any other employer.

IN WITNESS WHEREOF, the Parties have signed this Amendment effective as of the day and year below.

**MATTHEW HUSMAN**

Signed: _Matthew Husman_
90C3D8C6BE71462...

Printed: Matthew Husman

Dated: 3/2/2020 | 12:30:20 PST

**CHURCH & DWIGHT CO., INC.**

By: _Curt E. Siverling_

Printed: Curt E. Siverling

Dated: March 25, 2020

**ZEE COMPANY**

By: _Jonathon Bullard_
38FD0FFE353D444...

Printed: Jonathon Bullard

Dated: 3/2/2020 | 18:30:10 CST

41810250.1

3

# EXHIBIT 3

**STATE OF IOWA**     )
                     )    **SS**
Dallas **COUNTY**    )

## AFFIDAVIT OF JUDY ERNST

I, Judy Ernst, do hereby declare, affirm, certify, verify, and state as follows:

1.     I am over eighteen years of age, the statements in this declaration are made from my personal knowledge, and I am competent to testify to the matters stated in this declaration.

2.     I have been employed by Church & Dwight Co., Inc. ("C&D")[1] since September 2016, most recently as an Order Fulfillment Representative.

3.     C&D, through its Arm & Hammer Animal and Food Production Department, markets, sells, and distributes food sanitation and safety products, as well as related equipment and application systems, to meat processing companies, which are C&D's ultimate customers.

4.     My job responsibilities include overseeing all food safety product orders going out to customers to ensure orders are processed, fulfilled, and delivered correctly and in a timely manner. I also order and deliver promotional items and business related gifts for C&D sales representatives to give to our customers.

5.     In my role as Order Fulfillment Representative, from September 2016 until December 2019, I worked closely with Matthew Husman, the former Director of Sales for C&D. Husman and I worked together on a regular basis and would often communicate about customer needs, questions, the status of orders, billing and invoices, payments, promotional items for customers, etc.

6.     C&D sales representatives previously provided ████████, one of the customers to whom C&D sold food sanitation products, with leather gloves as a promotional gift.

---

[1] Church & Dwight is the successor by merger with Passport Food Safety Solutions, Inc.

7.     In December 2019, Husman's employment with C&D ended, and he subsequently commenced employment with Zee Company, a direct competitor with C&D in the food sanitation products market.

8.     Between January and February 2021, Husman and I exchanged sporadic social text messages.

9.     At some point in February or March 2021, Husman called and asked me whether C&D still had any of the leather gloves that C&D previously provided to ████████. Husman told me that an employee at ████████ liked the gloves, but that the pair he received from C&D were worn out, and that he wanted to procure a replacement pair from C&D for the customer.

10.     I told Husman that C&D no longer had the leather gloves, so I could not provide him with a new pair.

11.     On December 8, 2021, an employee of ████████, informed me that ████████ would no longer be purchasing food sanitation products from C&D.

Further Affiant sayeth naught.

Dated: 12/27/2021          By: *Judy Ernst*
                               Judy Ernst

SWORN TO BEFORE ME and subscribed in my presence this 27ᵗʰ day of December 2021.

My Commission Expires: 2/5/2024          _____
                                              Notary Public



JADZIA F COX
Commission No.830007
My Commission Expires
2/5/2024

49701189.1

# EXHIBIT 4

**AFFIDAVIT**

**STATE OF IOWA**      )
                       )   SS.
_CASS_ **COUNTY**   )
                       )
                       )

I, Brent Marnin, do hereby declare, affirm, certify, verify, and state as follows:

1.      I am over eighteen years of age, the statements in this affidavit are made from my personal knowledge, and I am competent to testify to the matters stated in this affidavit.

2.      I have been employed by Church & Dwight Co., Inc. ("C&D")[1] since June 17, 2019, most recently as U.S. Beef Business Manager for C&D out of the West Des Moines, Iowa facility.

3.      C&D, through its Arm & Hammer Animal and Food Production Department, is in the business of distributing, developing, producing, marketing and selling food safety products to meat processing companies, including bacteriophage and biocide products and in architecting, building, installing and operating advanced analytics solutions. These products include bacteriophage products sold by C&D under the Finalyse™ brand name and bromine chemistry sold by C&D under BoviBrom™ and other related brand names including AviBrom™ and PorciBrom™.

4.      Prior to joining C&D, I worked in sales for Zee Company ("Zee"), a member of The Vincit Group. Zee directly competes with C&D in a number of ways, including but not limited to the production of bacteriophage products that compete with the Finalyse™ brand and in the supply of bromine chemistry and peracetic acid products.

---

[1] C&D is the successor by merger to Passport Food Safety Solutions, Inc.

1

5.      During my employment with Zee, I met and came to know Randy Johnston who is now an Area Manager for Zee.

6.      After starting work for C&D in 2019, I reported directly to Matthew Husman. Husman and I worked closely together to call-on, service, and sell the bacteriophage products and bromine chemistry products sold by C&D to its customers.

7.      Since January 2021, Husman has called me approximately five times. Husman stated that he was not selling bacteriophage products, but continued to inquire about C&D sales operations and about C&D's business strategy and plans for selling bacteriophage and bromine chemistry products.

8.      On or around September 22, 2021, I learned that Zee provided a quote for bromine chemistry products to ███████████, one of C&D's customers, at a much lower price than C&D charged ███████████ for the products.

9.      After I learned about the price quote Zee provided to ███████████, I called Johnston. During our conversation, Johnston told me that he had no experience selling the bromine chemistry products and neither did anyone else at Zee, but that Husman had lots of experience selling the bromine chemistry products; that Husman was very familiar with the Competitive Products, the related equipment, and technology, and Husman passed this information on to Johnston and Zee's other Area Managers; that Husman directed Johnston and other Area Managers at Zee of the specific customers to go after to sell the bromine chemistry products, including ███████████ and other companies who were also customers of C&D; and that Husman was leading Zee's marketing strategy and activities for selling the bromine chemistry products, including being involved in Zee providing the sales quote to ███████████.

10.    On or around November 11, 2021, , Facilities Manager for ███████, one of C&D's customers, called me and said that Zee offered to sell ███████ bromine chemistry products for a lower price than what C&D charged. ███ told me that Nick Moore, an Area Manager for Zee, also told him that Zee had the exclusive right to sell the bromine chemistry products supplied by Albermarle. I told ███ that was not true and that C&D still sold and distributed the bromine chemistry products supplied by Albermarle.

11.    Near the end of November 2021, Husman called me and we discussed how bromine chemistry product pricing had become a race to the bottom. Husman stated that the private equity firm that purchased Zee only cares about topline sales. Husman told me that as a result Zee would be offering the bromine chemistry products for sale at a price per pound that was much lower than what C&D charged for the same or similar products.

Further Affiant sayeth naught.

Dated: 1/20/22                    By: 
                                     Brent Marnin

SWORN TO BEFORE ME and subscribed in my presence this _____ day of January, 2022.

My Commission Expires: 3/20/2024    _____
                                        Notary Public



HALEY KICKLAND
Commission Number 739775
My Commission Expires
March 20, 2024

49946624.1

3

# EXHIBIT 5



LAW OFFICES

GRANT KONVALINKA & HARRISON, P.C.

Ninth Floor, Republic Centre
633 Chestnut Street
Chattanooga, Tennessee 37450-0900

Telephone  423/756-8400
Facsimile  423/756-6518
www.gkhpc.com

December 10, 2021

**VIA U.S. MAIL AND**
**EMAIL (bvinti@proskauer.com)**
Baldassare Vinti
Proskauer Rose LLP
Eleven Times Square
New York, NY  10036-8299

      Re:    Church & Dwight Co., Inc. and Zee Company

Dear Mr. Vinti:

    This firm represents Zee Company in connection with responding to your December 6, 2021 letter concerning Zee Company's communication about BoviBrom.

    This morning, Zee Company Sales Representative Nick Moore sent an email to Aurora Packing, a potential Zee Company client, clarifying an email he had sent last month. Mr. Moore's email, attached hereto, explains that Mr. Moore mistakenly had said that Zee Company had an exclusive arrangement for the distribution of BoviBrom. The attached email corrects that misstatement.

    I trust the corrective email addresses your client's concerns and concludes this matter.

                Sincerely,

                J. Scott McDearman

JSM/cm
Enclosure
cc:    Jonathon Bullard

**From:** Nick Moore <nick.moore@vincitgroup.com>
**Sent:** Friday, December 10, 2021 11:31 AM
**To:** fraspaldo@aurorapacking.com
**Cc:** Tony Liles <tony.liles@vincitgroup.com>
**Subject:** Zee Company Clarification

Hi Franky,

I wanted to clarify an email I sent you in early November related to BoviBrom. I mistakenly said that we have an exclusive on the product, when what I meant to say is that there is no longer an exclusive on the product, as there has been in the past, and we have the ability to sell this product to you. I apologize for the mistake in my email and would still appreciate the opportunity to show you how I believe Zee Company can provide superior services at an economical cost to your facility.

Have a great weekend and hope to catch up soon,
Nick Moore


**Nick Moore**
Area Manager
Zee Company-Member Of The Vincit Group
www.vincitgroup.com


Mobile   423.602.0455


*Confidentiality Notice: This email communication and any attachments may contain proprietary and privileged information for the use of the designated recipients named above.  Any unauthorized review, use, disclosure, or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and/or any attachments.*